```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
7-ELEVEN, INC.,

                        Plaintiff,           MEMORANDUM & ORDER
                                             11-CV-5455(JS)(AKT)
        -against-

SUNEIL MINHAS,

                        Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:     Stephen Sussman, Esq.
                   Susan V. Metcalfe, Esq.
                   Duane Morris LLP
                   1540 Broadway
                   New York, NY 10036

For Defendant:     Michael Einbinder, Esq.
                   Einbinder & Dunn, LLP
                   104 West 40th Street, 20th Floor
                   New York, NY 10018
```

SEYBERT, District Judge:

Plaintiff 7-Eleven, Inc. ("7-Eleven") commenced this action against defendant Suneil Minhas ("Minhas") for breach of contract and injunctive relief. The dispute concerns the terms of a franchise agreement. Trial is scheduled to begin on July 6, 2015. Two motions in limine are before the Court: (1) Defendant's motion to exclude certain contractual disclaimer provisions as evidence at trial, (Docket Entry 71), and (2) Plaintiff's motion to exclude a draft "Termination Agreement" as evidence at trial, (Docket Entry 72). For the foregoing reasons, Defendant's motion is DENIED and Plaintiff's motion GRANTED.

BACKGROUND

In December 2009, Minhas met with Martina Hagler, a 7-Eleven representative, to discuss entering into a franchise agreement for a 7-Eleven store. (Am. Ans., Docket Entry 25, ¶ 40.) In June 2010, Hagler provided Minhas with a franchise disclosure document ("FDD") and informed Minhas that he needed to prepare a business plan before he could be considered for a franchise. (Am. Ans. ¶¶ 41-42.) Minhas created a business plan which estimated that total sales for the first year of his store would be approximately $1,700,000 and his net income would be approximately $75,000. (Am. Ans. ¶¶ 43-44.)

During a meeting in July 2010, Minhas discussed his business plan with Hagler and Rochelle Oppedisano-Ganss ("Oppedisano-Ganss"), a 7-Eleven Market Manager. (Am. Ans. ¶ 45; Joint Pre-Trial Order ("JPTO"), Docket Entry 65, at 5.) Minhas claims that, during the meeting, Oppedisano-Ganss told him that "his earnings estimates were too high," and instructed him to lower his projected first year total sales to $1,300,000, and to lower his projected net income to approximately $50,000. (Am. Ans. ¶¶ 46, 47.) Minhas asserts that neither his business plan nor Oppedisano-Ganss's earnings estimates were included in the FDD filed with the State of New York. (Am. Ans. ¶ 48.)

On August 2, 2010, Minhas and 7-Eleven entered into a Franchise Agreement for Store No. 2422-34257A, located in Old

2

Bethpage, New York (the "Store"). (Am. Compl., Docket Entry 16, ¶ 7.) The Franchise Agreement and certain documents executed contemporaneously with the Franchise Agreement contained provisions disclaiming reliance upon prior representations made by 7-Eleven. For example, a document called the "Disclaimer for Business Plan" states:

> I/we acknowledge that the Business Plan is intended as an additional part of the qualification process and the acceptance of me/us as franchisee(s) by 7-Eleven is not to be construed as 7-Eleven's representation that the sales and earnings calculations which I/we have set forth in the sample financial statement for the store will be achieved.
>
> I/WE ALSO UNDERSTAND AND ACKNOWLEDGE ACTUAL SALES ANS EARNINGS OF THE FRANCHISE BUSINESS ARE AFFECTED BY MANY FACTORS, INCLUDING THE FRANCHISEE'S OWN EFFORS, ABILITY AND CONTROL OF HIS OR HER STORE, AS WELL AS FACTORS OVER WHICH THE FRANCHISEE HAS NOT CONTROL. I/WE FURTHER ACKNOWLEDGE THAT 7-ELEVEN DOES NOT REPRESENT THAT ANY PROSPECTIVE FRANCHISEE WILL HAVE A PROFITABLE OPERATION OR ACHIEVE THE RESULTS SET FORTH IN THE SAME FINANCIAL STATEMENT.
>
> I/we hereby release and hold harmless 7-Eleven, its officers, directors, employees and agents from any and all claims I/we may have which may in any way arise out of or relate to the preparation of the Business Plan or 7-Eleven's acceptance of the Business Plan as part of the qualification process.

(Einbinder Decl., Docket Entry 71-2, Ex. B). In addition, Section 31 of the Franchise Agreement, states in relevant part:

> No act or omission by you or us . . . will constitute a waiver of . . . (b) the other

> party's breach of this Agreement, unless it is a waiver in writing, signed by the party to be bound as provided in Paragraph 31(g) below . . . .
>
> (g) . . . You further represent and warrant that you have not relied on and neither [7-Eleven] nor any of its agents or employees have not made any representations relating to the Store except as expressly contained in this Agreement, or (i) as to the future or past income, expenses, sales volume or potential profitability, earnings or income of the Store or any other location, except as provided in [the FDD] . . . .

(Einbinder Decl. Ex. E.)

The Franchise Agreement also contains the following condition: "all licenses, permits, and bonds required by applicable laws or regulations or by [7-Eleven] for the operation of the Store . . . must be available and, where possible, obtained." (Einbinder Decl., Docket Entry 74-4, Ex. B.) 7-Eleven contends that this provision required Minhas to obtain a Beer and Wine Products License ("Beer License") for the Store. (Am. Compl. ¶¶ 9.) When the Store opened in December 2010, however, Plaintiff allowed Defendant to sell beer and wine using Plaintiff's corporate license. Minhas then began the process to obtain a Beer License by communicating with a liquor license facilitator. (Supp. Metcalfe Decl., Docket Entry, 76-3, Ex. 3 at 187:23-193:15.) But Minhas never obtained his own Beer License and continued using 7-Eleven's corporate license. (Metcalf Decl. Ex. 2 at 245:4-21.)

4

On October 8, 2011, Minhas received an e-mail from Tom Kester, his Beer License facilitator. Mr. Kester asked Minhas to call him immediately, stating: "I heard recently that you were actually still in possession of the store. This surprised me as you never followed through with the application requirements, or responded to my contacts earlier this year." (Supp. Metcalfe Decl. Ex. 3 at 258:3-8.) The next day, Minhas responded to Kester's e-mail: "I thought we were all in order I didn't know there was a problem, last time we spoke, I had given you paperwork and was awaiting the license. Give me a call . . . ." (Supp. Metcalfe Decl. Ex. 3 at 248:3-7.) Kester replied two days later, "you may want to rethink that response before I call you later today." (Supp. Metcalfe Decl. Ex. 3 at 249:15-16.) Kester wrote to Minhas again the next day, "[y]ou will be contacted by someone from [7-Eleven] corporate about the situation soon." (Supp. Metcalfe Decl. Ex. 3, Depo. Ex. 29.) On October 13, Mr. Kester wrote a letter to Minhas enclosing a refund of his Beer License application fees. Kester stated in the letter, "you never supplied any of the documents we requested which were required for us to attempt to complete your Beer License application, thereby long ago abandoning the process[.]" (Supp. Metcalfe Decl. Ex. 3, Depo. Ex. 30.) During his deposition, Minhas testified that he disagreed with Mr. Kester's letter at the time he received it. (Supp. Metcalfe Decl. Ex. 3 at 253:5-254:3.)

On Friday, October 14, 2011, Minhas attended a meeting with 7-Eleven's Rochelle Oppedisano-Ganss. (Metcalfe Decl. Ex. 3 at 253:5-254:3.) During that meeting, Ms. Oppedisano-Ganss explained that Minhas failed to obtain his Beer License as agreed. (Supp. Metcalfe Decl. Ex. 3 at 256:9-10.) Minhas told her:

> There must be a mistake. I said, I told Tom [Kester], I thought that Tom was handling it, and all the paperwork was in order and I was just waiting for my license. I said, please don't do this, let me get my license, why can't I get my license now.

(Supp. Metcalfe Decl. Ex. 3 at 256:12-17.) Ms. Oppedisano-Ganss also presented Minhas with a document titled "Buyout and Franchise Termination Agreement" (the "Termination Agreement"). (Metcalfe Decl. Ex. 3 at 256:1-6.) Under the terms of the Termination Agreement, 7-Eleven offered to refund Minhas' $362,900 franchise fee in exchange for Minhas' agreement to vacate the store. (Metcalfe Decl., Docket Entry 72-4, Ex. B.) The Termination Agreement contained the following language concerning Minhas' obligation to obtain a beer license:

> Franchisee has failed to obtain the Beer and Wine License for the Store because Franchisee has been selling beer and wine under our corporate license, which is contrary to New York law, Franchisee is now currently unable to obtain such License and the continuing sale of beer and wine under our corporate License at the Store puts Franchisee at risk of significant civil penalty and would likely prohibit Franchisee from acquiring a beer and wine license in the future[.]

6

(Metcalfe Decl. Ex. B at 1.) The Termination Agreement also included a confidentiality provision that referred to the Termination Agreement as a "Settlement Agreement."[1] (Metcalfe Decl. Ex. B ¶ 12.) Minhas refused to sign the Termination Agreement and continued in possession of the Store. In this action, 7-Eleven seeks possession of the Store, based upon a determination either that the Franchise Agreement never took effect or, alternatively, that Minhas breached the agreement by failing to apply for and obtain a liquor license. (See JPTO at 4.) Minhas asserts various counterclaims against 7-Eleven, including allegations that 7-Eleven violated Sections 683 and 687 of the New York Franchise Act (the "Franchise Act" or "the Act"), codified within the New York

---

[1] The full text of the confidentiality provision provides that:

> [t]he terms and conditions of this Agreement are private and confidential, and Franchisee and 7-Eleven shall not reveal the terms and conditions to any third party, except pursuant to court order or valid directive from a government agency. The parties hereto acknowledge the importance of not revealing any of the terms and conditions of this Settlement Agreement to any third parties, and acknowledge their reliance on the representations contained herein as a material part of this Agreement.

(Metcalfe Decl. Ex. B, ¶ 12.)

7

General Business Law ("GBL").  (See Am. Ans., Docket Entry 25, ¶¶ 58-95.)

DISCUSSION

I. Minhas' Motion in Limine

Minhas asserts, among other claims, that he was defrauded into entering into the Franchise Agreement in violation of GBL § 687 because 7-Eleven provided earnings estimates that "contained false and misleading" information that he relied upon. (Am. Ans. at ¶ 92.)  He now seeks to preclude 7-Eleven from using the Disclaimer Provisions contained in the documents he signed as evidence at trial.  In support, Minhas argues that under the New York Franchise Sales Act ("FSA"), the Disclaimer Provisions are "unlawful" and therefore the Court should find that they are "irrelevant" under Federal Rule of Evidence 401. (Def.'s Br. Supp. Mot. to Exclude Disclaimers, Docket Entry 71, at 1.)  Plaintiff argues, inter alia, that because reliance is an element of Minhas' GBL § 687 fraud claim, the jury should consider the Disclaimer Provisions as evidence tending to disprove that Minhas' relied on 7-Eleven's pre-contractual representations.  (See Pl.'s Opp. Br. to Exclude Disclaimers, Docket Entry 73, at 6.)

Under the Franchise Act, franchisors must provide prospective franchisees with an "offering prospectus" containing "[a]ny representation of estimated or projected franchisee earnings or income, together with a statement setting forth the

8

data, methods and computations upon which such estimate or projection is based." GBL § 683. The anti-fraud provisions of the Act also make it unlawful to [m]ake any untrue statement of a material fact or omit to state a material fact necessary . . . to make the statements made . . . not misleading. GBL § 687(2)(b). Further the Franchise Act contains two provisions prohibiting franchisee from waiving rights under the Act. <u>First</u>, the act states that "[a]ny condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void. GBL § 687(4). <u>Second</u>, the Act states that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article." GBL § 687(5).

Three recent cases specifically discuss the effect of disclaimer provisions within this statutory scheme. In <u>Emfore Corp. v. Blimpie Associates, Ltd.</u>, 51 A.D.3d 434, 435, 860 N.Y.S.2d 12, 14 (1st Dep't 2008), a franchisee represented within a questionnaire that he did not rely on pre-contractual representations made by the franchisor. <u>Emfore</u>, 51 A.D.3d at 435, 860 N.Y.S.2d at 12. The franchisor argued that the franchisee's fraud claim was barred by answers the franchisee gave in the questionnaire. <u>Id.</u> The court rejected the argument, however, and

9

held that the waiver the franchisee signed was "barred by the Franchise Act" and factual questions remained regarding the extent of the franchisee's reliance upon the Franchisor's representations. Id. Similarly, in Solanki v. 7-Eleven, No. 12-CV-0027, 2014 WL 320236, at *5 (S.D.N.Y. Jan. 29, 2014) the court held that a waiver provision was void based on GBL § 687. In Solanki, a franchisee alleged that a franchisor fraudulently induced him to enter into the franchise agreement by providing sales projections that never came to fruition. Id. at *3. The Franchisor moved for summary judgment arguing, that the franchisee could not prove fraud as a matter of law because the franchisee disclaimed reliance on the projections in writing. Id. at *5. The court rejected this argument and, relying on the First Department's decision in Emfore, held that "any disclaimers reviewed, acknowledged or signed by [the Franchisee could not] bar his claims." Id.

Conversely, in Governara v. 7-Eleven, No. 13-CV-6094, 2014 WL 4476534 (S.D.N.Y. Aug. 20, 2014), Judge Loretta A. Preska decided that a disclaimer provision completely barred a fraud claim brought pursuant to GBL § 687. See Governara, 2014 WL 4476534, at *7. There, a franchisee claimed that a 7-Eleven representative defrauded him by making pre-contractual sales projections that the franchisee relied upon. Governara, 2014 WL 4476534, at *1. But the court dismissed the franchisee's GBL § 687 fraud claim,

10

reasoning that the franchisee "specifically disclaim[ed] reliance upon [7-Eleven's representations]." Id. at *5. Judge Preska relied upon the New York Court of Appeals' seminal case, Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 321, 157 N.E.2d 597, 602 (1959), which reiterated the common law contract principle that "parties who specifically disclaim reliance upon a particular representation cannot subsequently claim reasonable reliance upon it." Governara, 2014 WL 4476534, at *5. The court also rejected the idea that the Franchise Act changes the common law rule for fraud claims brought pursuant to the Franchise Act. The court reasoned that "[b]ecause the [Franchise Act] does not give franchisees the statutory right to purchase a franchise while relying on verbal representations outside of a written contract, the Agreement's non-reliance disclaimer is not proscribed per se by the [Franchise Act]." Id. at *6 (emphasis in original).

Here, Minhas claims that he was defrauded into entering into a franchise agreement with 7-Eleven because 7-Eleven provided Minhas with false or misleading sales projections that he relied on. One of the express policies of the Franchise Act is to "prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled." GBL § 680. To that end, the Franchise Act explicitly states that "[i]t is unlawful to require a franchisee to assent to a release, assignment, novation, waiver or estoppel which would

11

relieve a person from any duty or liability imposed by this article" and that "[a]ny condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder, shall be void." GBL § 687(4), (5). Thus, GBL § 687(4) and (5) depart from the common law rule that parties who disclaim reliance upon an oral representation in writing cannot subsequently rely upon it. Since Minhas' fraud claims are specifically brought pursuant to the anti-fraud provisions in the Franchise Act, they are not barred by the Disclaimer Provisions he signed. See Emfore, 51 A.D.3d at 435, 60 N.Y.S.2d at 14; Solanki, 2014 WL 320236, at *5. However, whether Minhas relied upon 7-Eleven pre-contractual representations is still an element fraud that he must prove to the jury by a preponderance of the evidence. Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive."). Therefore, the Disclaimer Provisions--just like the rest of the contract documents Minhas signed--are relevant to determining whether Minhas relied upon 7-Eleven's allegedly fraudulent representations. Given that the Disclaimer Provisions are part of legal documents that jurors may not be familiar with, however, the parties may submit proposed jury instructions clarifying the

relevance of the Disclaimer Provisions to Minhas' fraud claim. Defendant's motion in limine is therefore DENIED.

## II. 7-Eleven's Motion in Limine

7-Eleven moves to exclude the Termination Agreement that it presented to Minhas on October 14, 2011. Plaintiff argues that admitting the Termination Agreement as evidence at trial would violate Federal Rule of Evidence 408 because the Termination Agreement was a settlement offer. (Pl.'s Br. Supp. Mot. to Exclude Termination Agreement, Docket Entry 72-3, at 4.) Defendant argues in opposition that: (1) the Termination Agreement was not a settlement offer, and (2) even if it was settlement offer, Minhas use of the document is permissible under Rule 408 because Minhas seeks to use the document to establish that certain admissions of fact were made. (See Def.'s Opp. Br. to Mot. to Exclude Termination Agreement, Docket Entry 74-2, at 4.) Specifically, Minhas seeks to use the Termination agreement to establish: (1) that Minhas was selling beer and wine under 7-Eleven's corporate license, (2) that doing so was contrary to New York law, and (3) that Minhas is now unable to obtain a beer license. (Def.'s Opp. Br. to Motion to Exclude Termination Agreement at 4.)

### A. Whether the Agreement Falls under Rule 408

Plaintiff claims that admitting the Termination Agreement into evidence would violate Federal Rule of Evidence 408 because it was an offer to settle the parties' dispute. (Pl.'s

13

Br. Supp. Mot. to Exclude Settlement Agreement at 4.) Defendant disagrees and claims that the document was a business communication. (Def.'s Opp. Br. Motion to Exclude Termination Agreement at 3-4.) Federal Rule of Evidence 408 states in relevant part, "conduct or a statement made during compromise negotiations about the claim" is not admissible "to prove or disprove the validity or amount of the dispute claim or to impeach a prior inconsistent statement or a contradiction." FED. R. EVID. 408. "All that is needed for Rule 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim." Alpex Computer Corp. v. Nintendo Co., 770 F. Supp. 161, 162 (S.D.N.Y. 1991). For example, in Alpex Computer, the court excluded letters the plaintiff sent to companies that put them on notice of a potential patent dispute and offered to settle the dispute. Id. at 163-65. The court explained that "[b]y offering to settle what it viewed as meritorious infringement claims, [the plaintiff] hoped to avoid litigation," and thus its decision was "consistent with the underlying policy of the rule. Id. at 163. But see Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1372 (10th Cir. 1977) (holding that it was not an abuse of discretion to admit into evidence business communications between the parties concerning the permissible use of a trademark that took place before litigation commenced). Here, the Termination Agreement

14

falls within the protection of Federal Rule of Evidence 408 because it was an offer to settle a dispute. A dispute "need not crystalize to the point of threatened litigation for the 408 exclusion to apply." Weems v. Tyson Foods, Inc., 665 F.3d 958 (8th Cir. 2011). Before Minhas was presented with the Termination Agreement, emails and testimony show that Minhas knew or should have known there was a problem with his Beer License. Moreover, Oppedisano-Ganss told Minhas during their October 14, 2011 meeting that he had failed to obtain his Beer License as agreed. The Termination Agreement also contains a confidentiality provision that specifically refers to the agreement as a "Settlement Agreement." Thus, Minhas was on notice that the Termination Agreement was presented as an offer to settle the parties' dispute; through its terms, Minhas could receive a refund of his license fee and, in exchange, he would vacate the store. Just because Minhas viewed the terms of the Termination Agreement as unfair does not change the fact that it was an offer to settle. Therefore, the Termination Agreement was a settlement offer within the meaning of Rule 408.

    B.    <u>Whether the Termination Agreement is Admissible for Another Purpose</u>

Minhas argues that even if the Termination Agreement falls within the Rule 408, he should be allowed to use the document at trial because it contains admissions of fact. (Def.'s Opp. Br. to Mot. to Exclude Settlement Agreement at 4-5.). In response,

15

Plaintiff argues that Defendant seeks to use statements within the Termination Agreement to prove that 7-Eleven breached the covenant of good faith and fair dealing in violation of Rule 408. (Pl.'s Reply Supp. Mot. to Exclude Settlement Agreement at 5.)

In furtherance of the public policy of encouraging settlements and avoiding wasteful litigation, Rule 408 bars the admission of most evidence of offers of compromise and settlement. Trebor Sportswear Co. v. The Ltd. Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989). However, this bar is not absolute. "Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose,' i.e., for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle." Id. For example, in PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., 520 F.3d 109, 114 (2d Cir. 2008), the court allowed the defendant in a trademark infringement suit to introduce evidence that, during settlement discussions, the plaintiff gave the defendant permission to use the trademark at issue. Id. There, the defendant sought to introduce the evidence to establish its estoppel defense to the plaintiff's infringement claim. Id. The court reasoned that allowing the settlement negotiations into evidence for that limited purpose was permissible because the evidence was being used to prove an affirmative defense rather than a "primary claim." Id. At 114. In Trebor Sportswear, 865 F.2d 506, 510 (2d Cir.

16

1989), however, the court held that a letter intended to settle a breach of contract dispute could not be used by the plaintiff to show that the writing requirement of the statue of frauds had been met. Trebor Sportswear, 865 F.2d at 506. There, the court explained that "satisfying the statute of frauds was the necessary first step to proving, ultimately, the validity of their claims of breach of contract." Id.

Here, Minhas' use of statements made in the Termination Agreement is not permissible. Although Minhas claims the Termination Agreement will only be used to show 7-Eleven made "factual admissions," the statements in the Termination Agreement that 7-Eleven's corporate license was "illegal" and that Minhas could not obtain a liquor license in the future are disputed legal conclusions, not factual admissions. Moreover, Minhas intends to use these statements to show that 7-Eleven breached its duty of good faith and fair dealing, one of Minhas' affirmative claims. Cf. PRL USA Holdings, Inc. 520 F.3d at 114. Minhas thus cannot use statements made in the Termination Agreement as evidence at trial. 7-Eleven's motion in limine is therefore GRANTED.

## CONCLUSION

For the Foregoing reasons, Minhas' motion in limine (Docket Entry 71) is DENIED and 7-Eleven's motion in Limine (Docket Entry 72) is GRANTED.

SO ORDERED.

/s/JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: June  17 , 2015
       Central Islip, NY